MUCH SHELIST, P.C.
  Garrett Prybylo (SBN 304994)
  gprybylo@muchlaw.com
660 Newport Center Drive, Suite 900
Newport Beach, CA 92660
Tel:   (949) 767-2200

BRANCART & BRANCART
  Christopher Brancart (SBN 128475)
  cbrancart@brancart.com
Post Office Box 686
Pescadero, CA 94060
Tel:   (650) 8790141

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CPD HOLDINGS, LLC; PC HOLDINGS, LLC; and LAGUNA BEACH SOBER LIVING,  LLC,<br><br>            Plaintiffs,<br><br>    vs.<br><br>CITY OF ENCINITAS,<br><br>            Defendant. | No.  '21 CV0307 BEN WVG<br><br>COMPLAINT |

1.      Plaintiffs -- managers, operators, and owners of group homes in Encintas, California -- sue defendant City of Encinitas for discrimination on the basis of disability in violation of the Fair Housing Act, the Americans with Disabilities Act, and two related state laws.

2.      The City of Encinitas adopted Ordinance 2020-16 on December 16, 2020, amending its zoning regulations to drive housing for disabled persons out of Encinitas.  To achieve the City's discriminatory objective, Ordinance 2020-16

legislates separate and unequal zoning regulations -- one for disabled households and another for nondisabled households.   The same legal principles that ultimately invalidated Jim Crow zoning more than a century ago apply here to invalidate Ordinance 2020-16.

## I. JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 3613, 42 U.S.C. § 1983, and 42 U.S.C. § 12133.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiffs' additional claims under state law because plaintiffs' state law claims relate to plaintiffs' federal law claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

4.     Venue is proper because plaintiffs' claims arise from unlawful conduct occurring in San Diego County, California, where defendant City of Encinitas is located.

## II. PARTIES

5.     Since 2018, plaintiff CPD Holdings, LLC ("CPD"), a California limited liability company, has owned a single-family dwelling located at 846 Nolbey Street in Encinitas ("Nolbey House").  CPD owns and operates the Nolbey House for the purpose of providing housing to persons with disabilities.  It rents the Nolbey House to plaintiff Laguna Beach Sober Living, LLC, which is responsible for the management of the Nolbey House as a group home for disabled persons in recovery from addiction to drugs or alcohol. The Nolbey House is located in one of Encinitas's residential zoning districts -- specifically an R3 district -- and is subject to the Zoning Regulations of the City of Encinitas ("City").

6.     Since 2016, plaintiff PC Holdings, LLC ("PC"), a California limited liability company, has owned a single-family dwelling located at 915 Saxony Road

in Encinitas ("Saxony House").  PC owns and operates the Saxony House for the purpose of providing housing to persons with disabilities.  It rents the Saxony House to Laguna Beach Sober Living, LLC, which is responsible for the management of the Saxony House as a group home for disabled persons in recovery from addiction to drugs or alcohol. The Saxony House is located in one of Encinitas's residential zoning districts -- specifically an R8 district -- and is subject to the City's Zoning Regulations.

7.    Plaintiff Laguna Beach Sober Living, LLC ("LBSL") manages the Nolbey House and Saxony House on behalf of plaintiffs CPD and PC respectively. LBSL operates both houses as group homes for disabled people in recovery from addition to drugs or alcohol.  Under LBSL's management, each resident who occupies either the Nolbey House or the Saxony House must qualify as a disabled person within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), and the ADA, 42 U.S.C. § 12102.

8.    Defendant City of Encinitas is a general law city, established, organized and subject to the laws of the State of California.  Cal. Govt. Code §§ 34102, 37100.

### III.    FACTUAL ALLEGATIONS

#### A.    The City's Housing

9.    Founded in 1986 from an amalgamation of three unincorporated communities within San Diego County, the City of Encinitas covers 25 square miles, bounded by the Pacific Ocean to the west, the City of Carlsbad to the north, and the City of Solana Beach to the south.   Since its incorporation, the City has evolved from a small seaside community of 10,796 to a large bedroom community with a population of 62,828.

10.    Today, the City's housing stock and tenure of households are diverse. Of the City's 24,082 households, 75% occupy single-family dwellings, 22% occupy multifamily dwellings (apartments, duplexes), and the remaining 3%

reside in mobile homes. Within those households, 65% are occupied by families (related by blood or marriage), 25% are occupied by a single person, and 10% are occupied by "nonfamilies," which the City's Housing Element defines as "roomers/boarders, housemates/roommates, unmarried partners, foster children, and other non-relatives."  Among those households, 59% are owner-occupied, 33% are rented, and 8% are "vacant," which includes dwellings lacking a full-time occupant.

11.    Although deemed vacant, many of the City's "vacant" dwellings are not empty; instead, they are regularly rented by transients.  The City's high vacancy rate stems from the confluence of historic and contemporary trends. Historically, nonresidents have owned and occupied seasonal homes in Encinitas; more recently, the number of short-term rentals has increased dramatically thanks to marketing by internet platforms like Airbnb. The upshot is that more than half of the City's "vacant" dwellings have been siphoned off as seasonal or transient rentals by out-of- towners.

12.    Among the City's 24,082 households, the City reported as recently as November 2020 that it is aware of the existence of only five households that operate as group homes.  The Nolbey House and the Saxony House, owned and operated by plaintiffs, presumably account for two of those five group homes.

**B.  The City's Government**

13.    The municipal government of Encinitas is organized in accordance with the city manager model, which is typical among California's general law cities.  Cal. Govt. Code §§ 34102, 34851-34859.  Its legislative authority is vested in a city council, Cal. Govt. Code § 36501, which comprises four members, elected by districts, and a mayor, elected city-wide.  Subject to the laws of California and the United States, Cal. Govt. Code § 37100, the city council is empowered to adopt ordinances regulating Encinitas's municipal affairs. Cal. Govt. Code § 36934.

14.     Regulations governing the City's municipal affairs are codified in the Encinitas Municipal Code (EMC). Cal. Govt. Code § 50022.1.  The Code consists of 30 titles, covering every conceivable aspect of municipal affairs from Animal Regulations (Title 4) to Traffic (Title 14) to Zoning (Title 30).

15.     For example, under EMC Title 6, the City regulates certain businesses through a system of operations permits.  EMC 6.08.  Businesses that are required to obtain an operations permit include those that operate on public property, such as surfing schools, EMC 6.11-6.14, sidewalk vendors, EMC 6.15, news racks, EMC 6.24, and fireworks shows, EMC 6.24, as well as those that operate on private property, such as massage parlors, EMC 6.40.  EMC Title 9, encompassing the City's public safety regulations, is equally eclectic.  The City outlaws gambling, displaying exotic animals for amusement, public nudity, public and underage drinking, noisiness, graffiti, skateboarding on public property, watching illegal drag-races, the sale of dogs and cats (unless obtained from an animal shelter), the sale of psychoactive bath salts and glass etching cream (regardless of source), and the possession of large quantities of avocados without proof of ownership.  EMC 9.04, 9.12 - 9.29, 9.42-9.50, 9.20, 9.23, 9.42-9.80.

16.     Though subject to state law, the City possesses broad powers to enforce its municipal code.  Cal. Govt. Code §§ 36900, 36901.  Any code enforcement officer may issue criminal or administrative citations that impose fines and penalties for any violation of the municipal code.  EMC 1.08.080, 1.08.083, 1.08.090.  Any violation of the municipal code may be treated as a public nuisance.  1.08.030.  Violations may result in criminal charges.  1.08.050.  The City may sue to enjoin violators, EMC 1.08.060, or subject them to an administrative process seeking to abate nuisances and recovering the cost of that abatement, EMC 1.08.070.

///

///

### C. The City's Land Use Authority under State Law

17.     California has enacted a complex statutory framework that governs municipal land use, zoning, and housing regulations.

18.     Like every California city, Encinitas must adopt a general plan for the City's long-term development, Cal. Govt. Code §§ 65330-65302, which must include a Housing Element, Cal. Govt. Code § 65302. The Housing Element must be approved by the State Department of Housing and Community Development (HCD), Cal. Govt. Code § 65585, though Encinitas's Housing Element has been repeatedly rejected by HCD.  Cal. Govt. Code § 65585.  The City's zoning regulations must conform to its general plan, including its HCD-approved Housing Element.  Cal. Govt. Code § 65869; EMC 30.01.010.

19.     The State Housing Law also compels the City of Encinitas, like every other California city, to follow the uniform building and housing codes adopted by the HCD.  Cal. Health and Safety Code §§ 17922, 17958.   Under the Uniform Housing Code, adopted by HCD, the City must apply the same numerical occupancy limitation to each dwelling in the City regardless of type (house, duplex, apartment), tenure (owned or rented), or zoning district (single-family or multi-family).

20.     State law also requires that the City treat any single-family dwelling operating as a licensed treatment or care home and occupied by six or fewer disabled persons as if it were occupied by a family related by blood or marriage for purposes of zoning enforcement.  E.g., Cal. Health and Safety Code §11834.23.   State law also mandates that the City "administer its programs and activities relating to housing and community development in a manner to affirmatively further fair housing, and take no action that is materially inconsistent with its obligation to affirmatively further fair housing."  Cal. Govt. Code § 8899.50(b).

21.     Finally, because much of Encinitas is located within the California

Coastal Zone, the City's zoning powers are subject to its Local Coastal Plan, EMC 30.82, which implements the requirements of the California Coastal Act, Cal. Pub. Res. Code §§ 30000-30013.  As a result, the City's land use regulations, like Ordinance 2020-16, are subject to Coastal Commission review and determination for conformity with the City's Local Coastal Plan.

### D.  The City's Zoning Framework

22.     Pursuant to its general and local coastal plans, the City has adopted a zoning code, known as the City's "Zoning Regulations."  EMC 30.01.010.  (It also has enacted Specific Plans for five areas within the City; each Specific Plan adjusts some provisions within the City's Zoning Regulations to address the "unique characteristics of particular areas within Encinitas."  EMC 30.84.)

23.     To understand how Ordinance 2020-16 violates federal and state fair housing laws, it is necessary to understand how the City's Zoning Regulations operate.  Ordinance 2020-16 manipulates three components of the City's Zoning Regulations -- the Official Zoning Map (EMC 30.08.020), the zoning Definitions (30.04.010), and the Zoning Use Matrix (EMC 30.09.010) -- to discriminate against group homes occupied by disabled persons, including plaintiffs' Nolbey and Saxony Houses.

### 1.  The City's Official Zoning Map and Districts

24.     The City's Zoning Regulations adopt an Official Zoning Map, EMC 30.08.020, which divides the City into different zoning districts based on different land uses, EMC 30.01.050. Cal. Govt. Code §§ 65851-65851.  Each district is assigned a general zoning classification:  Residential, Commercial, Light Industry, Public, or Open Space.  EMC 30.08.010.  Each general classification is then broken down into a variety of subclassifications.  For example, the Residential Zone classification includes 13 subcategories, ranging from Rural Residential to Mobile Home Park. EMC 30.08.010(A). To complete its Official Zoning Map, the City applies "overlays," such as its five Specific Plans, EMC 30.01.050(B), along

with other special purpose land use designations, such as a Coastal Bluff Overlay or Agriculture Overlay. EMC 30.08.010(F).  Finally, within each residential subclassification, the City imposes another layer of regulations prescribing design standards that quantify minimum lot size and setbacks, dwelling dimensions, EMC § 30.16.010; *City of Encinitas Engineering Design Manual* (October 28, 2009), and parking standards, EMC 30.54.

25.    For example, plaintiffs' Nolbey House is situated in a residential district designated as an R3 district[1] and is therefore subject to design standards prescribed in EMC 30.16.010 B7 and parking restrictions prescribed in EMC 30.54.  Similarly, plaintiffs' Saxony House is situated in a residential district designated as an R8 district[2] and is therefore subject to design standards prescribed in EMC 30.16.010 B7 and parking restrictions prescribed in EMC 30.54.  Both houses are located in the California Coastal Zone, but neither is situated within one of the City's Specific Plans.

26.    Even if a land use fits within a zoning district's general classification (e.g., Residential, Commercial), each land use is subject to another layer of regulation that prescribes whether the specific use is permitted, conditionally permitted, or prohibited within each zoning district.  To determine the status of

---

[1]EMC 30.08.010(A) [R3] provides:  "Residential 3 is intended to provide for single-family detached residential units with minimum lot sizes of 14,500 net square feet and maximum densities of three units per net acre, as a rural to suburban transition. One primary dwelling is permitted on each legal lot. Single-family units may be attached to other single-family units provided each unit is located on a separate legal lot with approval of a PRD."

[2]EMC 30.08.010(A) [R8] provides:  "Residential 8 is intended to provide for suburban single-family detached residential units with minimum lot sizes of 5,400 net square feet and maximum densities of eight units per net acre. One primary dwelling is permitted on each legal lot. Single-family units may be attached to other single-family units provided each unit is located on a separate legal lot with approval of a PRD."

any particular use in any specific zoning district, it is necessary to consult the zoning Definitions (30.04.010) and Zoning Use Matrix (EMC 30.09.010).

## 2.   The City's Zoning Definitions

27.     The City's Zoning Regulations include definitions for various land uses and terms, arranged in alphabetical order from "Abut" to "Zoning Code." EMC 30.04.010.

## 3.   The City's Zoning Use Matrix

28.     The City's Zoning Regulations also include a Zoning Use Matrix, EMC 30.09.010, a massive table of rows and columns that specifies whether a particular use is permitted, conditionally permitted, or prohibited within each zoning district. The matrix contains hundreds of rows.  Each row specifies a land use, arranged alphabetically, from "Accessory Building" to "Yard Products Manufacture."  Some land uses listed in the matrix's rows are defined in the zoning Definitions, EMC 30.04.010, but many are not. (E.g., Rug Manufacture, Coins -- Buy and Sell.)  The matrix also contains more than a dozen columns.   Each column specifies a range of zoning classifications that correspond to the City's Official Zoning Map.  For example, the first column combines three Residential zone subcategories designated as Rural Residential (RR, RR-1, RR-2).  The cell at the intersection of each row (use) and column (zoning district) indicates whether a specific use (row) is permitted of right, conditionally permitted, or prohibited within specific zoning districts (column).  EMC 30.09.

## 4.   Conditionally Permitted Uses

29.     The distinction between a permitted and prohibited land use in a specific zoning district is straightforward.  But the distinction between a permitted and conditionally permitted use is not so simple.  If a use is conditionally permitted, then another layer of zoning regulation applies.

30.     A conditionally permitted use is prohibited unless it obtains a conditional use permit. EMC 30.74.020(A).  Different conditionally permitted

uses are subject to different conditional permitting processes.  The Zoning Use Matrix specifies the type of conditional permit that a land use must obtain in order to be located within each zoning district.  EMC 30.09.  These distinctions are significant because the burden, costs, and delay associated with each type of conditional permitting process vary widely.

31.    A "minor use permit" is determined by the City's Director of Planning and Building, EMC 30.80.020(A), 30.74.040(A); it typically involves ministerial or limited discretionary review of a permit application.  *Permit and Service Delivery — Performance Standards + Process Guide*, p. 10 (06/12/2015).  A "major use permit" must be determined by majority vote of the City's Planning Commission, EMC 30.80.020(A), 30.74.040(B), 2.34.040(B); it involves discretionary review of a permit application.  *Permit and Service Delivery*, p. 9. The application for a minor use permit is shorter, simpler, and cheaper than an application for a major use permit.  *Planning Application* (01/30/2019); *Planning Application Processing Fees* (08/18/2016).  A minor use permit may be issued without a public hearing, EMC 30.74.050, typically within four to nine months after applying.  *Permit and Service Delivery*, p. 30.  A major use permit may only be issued after a noticed, public hearing before the Planning Commission takes place, EMC 30.01.070(A), a process that typically takes between four months and one year. *Permit and Service Delivery*, p. 32.

### 5. Short-Term Rentals

32.    Among the City's many land uses, one use is privileged above all others.  The City allows short-term rentals ("STR") to operate anywhere in Encinitas.   The City defines "short-term rental" as "the rental of any structure or any portion of any structure for occupancy for dwelling, lodging or sleeping purposes of 30 consecutive days or less in the City, including single-family or duplex units."  EMC 9.38.020.  With just a few clicks of a computer mouse, the City permits any homeowner to convert her house, nestled in a quiet residential

neighborhood, into a bustling, week-by-week, short-term vacation or party rental for out-of-towners.

33.    In contrast to the application process for any zoning permit (major or minor), the application process for obtaining a STR permit requires five to ten minutes of computer time and a credit card.  A homeowner (or, more commonly, her agent or a vacation rental company) logs into the City's web portal, completes a few screens of information, attaches a sample rental agreement and proof of ownership or agency, and pays a modest fee.  Within a few weeks, the City Manager's office will issue a STR permit to the homeowner -- all without notice, findings, or a hearing.

34.    Turbocharged by internet platforms, and greased by the City's Amazon-simple web permitting, Short-Term Rentals have multiplied in Encinitas. In May 2019, the City reported that it had issued 420 STR permits, which captured only a fraction of the dwellings operating as Short-Term Rentals.  In 2017, for example, the City sent more than 300 letters to Encinitas homeowners whose homes were advertised as Short-Term Rentals, but lacked an STR permit.  As the number of Short-Term Rentals, permitted and unpermitted, has grown, so has the number of code enforcement complaints about them, accounting in 2019 for more than 10% of all nuisance complaints received by the City.

35.    Against this backdrop, the City enacted Ordinance 2020-16 to regulate group homes for disabled persons.

**E.  Ordinance 2020-16**

36.    Ordinance 2020-16 amends and adds several provisions to the City's Zoning Regulations (EMC, Title 30) and adds a chapter to the City's Welfare regulations (EMC, Title 9).

37.    To start, Ordinance 2020-16 expressly limits its application and scope to one narrow subset of dwellings – Group Homes – which it defines based on the disability status of a home's residents.  The ordinance adds a definition for

Handicapped, EMC 30-04:

> HANDICAPPED shall mean, as more specifically defined under the Fair Housing Laws, a person who has a physical or mental impairment that limits one or more major life activities, a person who is regarded as having that type of impairment, or a person who has a record of that type of impairment, not including current, illegal use of a controlled substance.

38. From that new definition, it creates and adds a definition for Group Home, EMC 30-04:

> GROUP HOME shall mean a facility that is being used as a supportive living environment for persons who are considered Handicapped, as that term is defined by this Chapter, under State or Federal law. A Group Home operated by a single Operator or service provider (whether licensed or unlicensed) constitutes a single facility, whether the facility occupies one or more dwelling units. Group Homes shall not include the following: (I) Residential Care Facilities; and (ii) any Group Home that operates as a Single Housekeeping Unit, as those terms are defined by this Chapter. For purposes of this definition, a "Group Home, Limited" serves six (6) or fewer persons, and a "Group Home, General" serves seven (7) or more persons.

39. From that new definition, it creates and adds a definition for Sober Living Home:

> SOBER LIVING HOME shall mean a Group Home for persons who are recovering from a drug and/or alcohol addiction and who are considered Handicapped under State or Federal law. For purposes of this definition, Sober Living Homes are not State-licensed and are not permitted to provide medical care, services and/or treatment on its premises. Sober Living Homes shall not include the following: (i) Residential Care Facilities; or (ii) any Sober Living Home that operates as a Single Housekeeping Unit. For purposes of this definition, a "Sober Living Home, Limited" serves six (6) or fewer persons, and a "Sober Living Home, General" serves seven (7) or more persons.

40. The heart of Ordinance 2020-16 is two new, interrelated municipal code chapters, Chapter 30.17, *Group Homes – Land Use/Zoning*, and Chapter 9.39, *Regulation of Group Homes*. Each chapter cross-references the other; to comply with one requires compliance with the other.   Both chapters apply solely to dwellings occupied by persons "considered Handicapped, as that term is defined by this Chapter, under State or Federal law."

### 1. Chapter 9.39:  Regulation of Group Homes

41. New Chapter 9.39 outlaws every existing and any future Group Home in Encinitas unless the home obtains a Group Home Permit.  EMC 9.39.030.

Existing Group Homes must apply for a Group Home Permit within 90 days of the effective date of Ordinance 2020-16 or face abatement.  EMC 9.39.070.

42.     To apply for a Group Home Permit, an applicant must disclose to the City more personal and business information and pass more restrictive qualifications than required of any other applicant for any other permit of any kind issued by the City.

43.     For example, a Group Home Permit applicant is automatically disqualified from obtaining a Group Home Permit (or, if granted, their Group Home Permit may be revoked), if she or any person who manages her Group Home, EMC 9.39.060(A):

•      has an employment history in which she or her employees were terminated during the past two years because of physical assault, sexual harassment, embezzlement or theft, falsifying a drug test, and/or selling or furnishing illegal drugs or alcohol;

•      has been convicted of or pleaded nolo contendere to, within the last seven to ten years, any of the following offenses:   (a) Any sex offense, including violations for which the person is required to register as a sex offender under California Penal Code Section 290 (last ten years); (b) Any arson offense, including violations of Penal Code sections 451-455 (last seven years); (c) Any violent felony, as that term is defined by Penal Code section 667.5, which involves doing bodily harm to another person (last ten years); or, (d)  The unlawful sale or furnishing of any controlled substances (last seven years); or

•      if the applicant's home is classified as a Sober Living Home, then neither the applicant nor any employee may be a "recovering drug or alcohol abuser and upon the date of application or employment has had less than one full year of sobriety."

44.     Along with her application, a Group Home Permit applicant must

submit the following documents to the City, EMC 9.39.040(b)(6)-(9):

- the Group Home's rules and regulations, subject to review and approval by the City;

- the Group Home's rental application approval procedures;

- the Group Home's "relapse policy," subject to review and approval by the City, and,

- "Blank copies of any application, lease and all other forms that residents and potential residents of the Group Home are required to complete"; and,

- "a signed statement by each owner or operator of the Group Home acknowledging [that] failure to comply with Federal, State or local laws, rules, or regulations, including the provisions of this Chapter and all applicable requirements of Title 30 of this Municipal Code, may result in the revocation of a Group Home Permit."

45.     Once a Group Home obtains a Group Home Permit, it must operate in accordance with several discriminatory restrictions, EMC 9.39.050:

- Regardless of the number of residents who occupy the Group Home, each Group Home must have a house manager present at the home 24/7;

- Each resident's vehicle must be operational, used as the resident's primary form of transportation, and parked within 500 feet of the Group Home; and,

- A Group Home must immediately evict any resident who does not comply with the Group Home's rules, but it cannot evict that resident unless the Group Home contacts the resident's emergency contact and the County of San Diego to identify available services for that resident, and must maintain records showing that these requirements were observed.

46.     Ordinance 2020-16 not only discriminates on the basis of disability generally; it also explicitly discriminates based on the type of disability suffered

-14-

by a dwelling's residents.

47.     If a dwelling is occupied by "persons who are recovering from a drug and/or alcohol addiction and who are considered Handicapped under State or Federal law," then the household is subject to additional, intrusive regulations, EMC 9.39.050(i):

•     Each resident must be "actively participating in an established recovery program" or face eviction from her dwelling;

•     Each resident is barred from using any lawful, nonprescription drug; if the resident possesses any over-the-counter medication, the resident must be evicted from her dwelling; and,

•     Each home must adopt a City-approved "good neighbor policy that shall direct residents to be considerate of neighbors, including refraining from *engaging in excessively loud, nuisance, profane or obnoxious behavior that would unduly interfere* with a neighbor's use and enjoyment of their dwelling unit. The good neighbor policy shall establish a written protocol for the owner/Operator or house manager to follow when a neighbor complaint is received."[3]

### 2.   Chapter 30.17:  Group Homes – Land Use/Zoning

48.     If a disabled household obtains a Group Home Permit pursuant to Chapter 9.39, then it must also comply with an additional set of land use requirements pursuant to new Chapter 30.17 or face abatement.

49.     If the Group Homes has six or fewer disabled residents, then it is only permitted in the zones identified in the Zoning Use Matrix, EMC 30.09.010, as

---

[3]This provision's text is the epitome of legislation reflecting a stereotype based on rank prejudice.   While the City mandates that Sober Living Homes (where drugs and alcohol are prohibited) adopt a good neighbor policy that bars "profane or obnoxious behavior" by its disabled residents, the City mandates that STR occupants -- vacationing or partying for a week or over a weekend -- refrain from "unreasonable noise or disturbances" or "disorderly conduct."

amended by Ordinance 2020-16, EMC 30.17.020(B):

| USES | RR RR-1 RR-2 | RS-11 R-3 R-5 R-8 | R-11 R-15 | R-20 R-25 | R-30 OL | MHP | OP | LC | GC | VSC | LI | BP | P/SP | ER/OS | L-LC | L-VSC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ZONES** | | | | | | | | | | | | | | | | |
| Group Home, Limited - 6 or fewer[11] | P | P | P | P | P[36] | X | X | X | X | X | X | X | X | X | X | X |
| Group Home, General - 7 or more[28,41] | C[29] | C[29] | C | C | C[36] | X | X | X | X | X | X | X | C | X | X | X |
| Sober Living Home, Limited - 6 or fewer[41] | P | P | P | P | P[36] | X | X | X | X | X | X | X | X | X | X | X |
| Sober Living Home, General - 7 or more[28,41] | C[29] | C[29] | C | C | C[36] | X | X | X | X | X | X | X | C | X | X | X |

If the Group Home has seven or more disabled residents, then it is only conditionally permitted in the zones identified in the amended Zoning Use Matrix, EMC 30.09 and, within certain zones, only if located on a busy, main street. EMC 30.09 n 29.

50.     Group Homes with seven or more residents must also apply for and obtain a "Conditional Use Permit (major)," a year-long process that involves a noticed, public hearing before the Planning Commission, which has discretion to impose additional restrictions on the Group Home, EMC 30.17.020(C).

51.     Chapter 30.17 also targets Group Homes for still more restrictions, EMC 30.17.020(D) and (E).  Among them, the most pernicious is a separation requirement imposed retroactively on every Group Homes, EMC 30.17.020(F):

A Group Home or Sober Living Home shall not be located within six hundred fifty (650) feet of any other Group Home, Sober Living Home, Residential Care Facility, or a State-licensed Alcoholism or Drug Abuse Recovery or Treatment Facility[4], as measured in a straight line, without regard to intervening structures, from the property line to property line.

52.    Thus, even if a Group Home obtains a Group Home Permit pursuant to Chapter 9.39 and meets each zoning restriction pursuant to Chapter 30.17, it remains a prohibited unless it beats any of the uses listed in EMC 30.17.020(F) in the race to occupy a 650-foot exclusion zone.

### 3.  Separate and Unequal Zoning Regulations

53.    As a result of the City's adoption of Ordinance 2020-16, the City's land use regulations now expressly discriminate based on disability as follows:

| Zoning Restriction | Group Homes, EMC 9.39, 30.17 | Short-term rentals, EMC 9.39 | Other rental dwellings |
|---|---|---|---|
| Housing expressly protected from discriminatory zoning by City pursuant to federal and state law | Yes | No | No |
| Mandates separation requirement between similar uses | Yes | No | No |
| Requires Conditional Use Permit (Major) if more than seven occupants | Yes | No | No |
| Mandates 24/7 onsite house manager | Yes | No | No |
| Disqualifies applicants for permits based on applicant *or* manager's employment, criminal, or disability history | Yes | No | No |

---

[4]The inclusion of licensed homes is problematic, since Cal. Health and Safety Code § 11834.23(a), provides "whether or not unrelated persons are living together, an alcoholism or drug abuse recovery or treatment facility that serves six or fewer persons shall be considered a residential use of property for the purposes of this article. In addition, the residents and operators of the facility shall be considered a family for the purposes of any law or zoning ordinance that relates to the residential use of property pursuant to this article."

| | | | |
|---|---|---|---|
| Authorizes permit revocation if dwelling fails "to comply with Federal, State or local laws, rules, or regulations, including the provisions of this Chapter and all applicable requirements of Title 30 of this Municipal Code." | Yes | No | No |
| Mandates eviction of occupant if occupant violates house rules | Yes | No | No |
| Mandates parking within 500 feet of dwelling | Yes | No | No |
| Mandates disclosure of dwelling's process for selecting renters | Yes | No | No |
| Requires that occupants engage in self-help program | Yes | No | No |
| Prohibits possession of nonprescription medication by occupants | Yes | No | No |
| Mandates Good Neighbor policy that explicitly bars "engaging in excessively loud, nuisance, profane or obnoxious behavior that would unduly interfere with a neighbor's use and enjoyment of their dwelling unit." | Yes | No | No |
| Allows transient occupancy | No | Yes | No |
| Applies to how many dwellings, as reported by City | 5 | 420 | 7,940 |
| Percentage of complaints to city code enforcement generated by the use | TBD | >10% | TBD |

**F.    The Implementation and Enforcement of Ordinance 2020-16
Threatens Plaintiffs**

54.    Plaintiffs own, operate, and manage two Group Homes in Encinitas, the Nolbey House and the Saxony House.  Each is occupied by seven or more disabled persons who are in recovery from addiction to drug or alcohol.  Thus, each house is subject to the discriminatory provisions enacted in Ordinance 2020-16.

55.    Even if each plaintiff successfully obtains a Group Home Permit

-18-

pursuant to new Chapter 9.39, then each plaintiff must obtain a Conditional Use Permit (Major), a year-long process that requires a notice public hearing before the Planning Commission.

56.   Even if each plaintiff successfully obtains a Conditional Use Permit pursuant to new Chapter 30.17, then its homes will nonetheless be prohibited unless the City determines that each is located along one of the City's busy, main streets.  EMC 30.09 n 29.

57.   Even if each home is located along a busy, main street, then each home will nonetheless be prohibited if it happens to be "located within six hundred fifty (650) feet of any other Group Home, Sober Living Home, Residential Care Facility, or a State-licensed Alcoholism or Drug Abuse Recovery or Treatment Facility, as measured in a straight line, without regard to intervening structures, from the property line to property line."  EMC 30.17.020(F).

58.   Even if each home is located outside a 650-foot exclusion zone, and is otherwise permitted, then each plaintiff must operate that home in accordance with draconian, burdensome, discriminatory restrictions, ranging from a 24/7 onsite manager, to mandatory participation in self-improvement program, to evicting tenants who possess any nonprescription medications.  EMC 9.39.050.

59.   Even if each plaintiff acquiesces to the City's discriminatory operational restrictions, then each must also engage in employment discrimination in violation of state and federal law by explicitly inquiring about and refusing to employ any person who qualifies as disabled based on their recovery from addiction, as mandated under EMC 9.39.060(A).

## IV.   CLAIMS

### A.   First Claim:  Federal Fair Housing Act

60.   Plaintiffs reallege and incorporate by reference each preceding paragraph.

61.     The City is a "person" subject to the FHA, 42 U.S.C. § 3602(d).

62.     The Nolbey House and Saxony House are each "dwellings" under the Fair Housing Act, 42 U.S.C. § 3602(b).

63.     The City commits the following discriminatory housing practices in violation of the Fair Housing Act, 42 U.S.C. § 3602(b), by enacting, implementing, and threatening the enforcement of EMC Chapters 9.39 or 30.17 or Chapter 30.09, as amended:

a.     42 U.S.C. § 3604(f)(1), by restricting or denying housing opportunities or other otherwise making dwellings unavailable because of disability, including:

  i.     Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of disability, 24 C.F.R. § 100.70(d)(5);

  ii.     Restricting or attempting to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling because of disability, 24 C.F.R. § 100.70(a);

  iii.     Discouraging any person from inspecting or renting a dwelling because of disability, 24 C.F.R. § 100.70(c)(1);

  iv.     Communicating to any prospective renter that he or she would not be comfortable or compatible with existing residents of a community because of disability, 24 C.F.R. § 100.70(c)(3); and,

  v.     Excluding any person from a particular section of a community or neighborhood because of disability, 24 C.F.R. § 100.70(c)(3).

b.     42 U.S.C. § 3604(f)(2), by imposing different terms and conditions on the rental or occupancy of a dwelling based on disability, including:

  i.     Engaging in any conduct relating to the provision of housing or

-20-

of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons because of disability, 24 C.F.R. § 100.70(b);

ii.     Inquiring to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a disability or to make inquiry as to the nature or severity of a handicap of such a person, 24 C.F.R. § 100.202(c);

iii.    Providing municipal services differently because of disability, 24 C.F.R. § 100.70(d)(4); and,

iv.     Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of disability, 24 C.F.R. § 100.70(d)(5).

c.     42 U.S.C. § 3604(c), by stating, printing or publishing a limitation based on disability regarding rental or occupancy of dwellings, including:

i.     Using words, phrases, symbols or forms which convey that dwellings are not available to a particular group of persons because of disability, 24 C.F.R. § 100.75(c)(1); and,

ii.     Expressing to agents, brokers, employees, prospective sellers or renters or any other persons a limitation on any renter because of disability of such persons, 24 C.F.R. § 100.75(c)(2).

d.     42 U.S.C. § 3617, by interfering with the exercise or enjoyment of federal fair housing rights, including:

i.     Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the rental of a dwelling because of disability, 24 C.F.R. §

-21-

100.400(c)(1);

ii.      Threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of the disability of such persons or of associates of such persons, 24 C.F.R. § 100.400(c)(2);

iii.     Intimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by the Fair Housing Act, 24 C.F.R. § 100.400(c)(4).

64.     Each plaintiff will prove that the City committed each of the discriminatory housing practices listed in paragraph 63 under either the disparate treatment theory, adducing direct and circumstantial evidence of the City's discriminatory intent or purpose, or under the disparate impact theory, adducing evidence of the exclusionary effect of the City's Zoning Regulations, or both.

65.     Each plaintiff is injured or threatened with injury by the City's commission of each discriminatory housing practice listed in paragraph 63; accordingly, each plaintiff is an "aggrieved person" under the Fair Housing Act, 42 U.S.C. § 3602(i).

66.     Accordingly, each plaintiff is entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(a), as follows:

a.     A declaration that Chapters 9.39 and 30.17 and 30.09, as amended, are unlawful and void, pursuant to 42 U.S.C. § 3615, which invalidates as a matter of federal law any municipal ordinance that permits or requires commission of a discriminatory housing practice in violation of the Fair Housing Act;

b.     An injunction barring the enforcement of Chapters 9.39 and 30.17 and 30.09, as amended, 42 U.S.C. § 3613(c)(1);

c.     An award of compensatory damages, 42 U.S.C. § 3613(c)(1); and,

d.     An award of attorneys' fees and costs, 42 U.S.C. § 3613(c)(2).

**B.  Second Claim:  Americans with Disabilities Act**

67.    Plaintiffs reallege and incorporate by reference each preceding paragraph.

68.    The City is a "public entity," subject to the Americans with Disabilities Act (ADA), 42 U.S. C § 12131(1)(B).

69.    Each plaintiff provides housing to qualified individuals with a disability, 42 U.S. C § 12131(2); thus, each plaintiff is an entity known to have a relationship or associations with disabled persons, 42 U.S.C. § 12134, 28 C.F.R. § 35.130(g).

70.    The City commits the following discriminatory practice in violation of the ADA, 42 U.S.C. § 12132, by enacting, implementing, and threatening the enforcement of EMC Chapters 9.39 or 30.17 or Chapter 30.09, as amended:

    a.    Limiting qualified individuals with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others pursuant to the City's Zoning Regulations, 42 U.S.C. §§ 12132, 12134(a); 24 C.F.R. § 35.130(b)(1)(vii);

    b.    Utilizing criteria or methods of administration in the City's Zoning Regulations that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability, 42 U.S.C. §§ 12132, 12134(a); 24 C.F.R. § 35.130(b)(3)(i);

    c.    Prescribing the sites and locations for Group Homes pursuant to the City's Zoning Regulations that have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination, 42 U.S.C. §§ 12132, 12134(a); 24 C.F.R. § 35.130(b)(4)(i); and,

    d.     Imposing or applying eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying of the City's Zoning

Regulations, 42 U.S.C. §§ 12132, 12134(a); 24 C.F.R. § 35.130(b)(8).

71.     Each plaintiff will prove that the City committed each of the discriminatory practices listed in paragraph 70 under either the disparate treatment theory, adducing direct and circumstantial evidence of the City's discriminatory intent or purpose, or under the disparate impact theory, adducing evidence of the exclusionary effect of the City's Zoning Regulations, or both.

72.     Each plaintiff is a "person aggrieved" as a result of the City's commission of the unlawful practices listed in paragraph 70, 42 U.S.C. § 12133, 29 U.S.C. § 794a.

73.     Accordingly, each plaintiff is entitled to relief under the ADA, 42 U.S.C. § 12133, as follows:

a.     A declaration that Chapters 9.39 and 30.17 and 30.09, as amended, are unlawful and void;

b.     An injunction barring the enforcement of Chapters 9.39 and 30.17 and 30.09, as amended;

c.     An award of compensatory damages; and,

d.     An award of attorneys' fees and costs.

   **C.  Third Claim:  California Fair Employment and Housing Act**

74.     Plaintiffs reallege and incorporate by reference each preceding paragraph.

75.     The City is an "owner" subject to the Fair Employment and Housing Act (FEHA), Cal. Govt. Code § 12927(e); 2 CCR § 20005(t)(4)-(5).

76.     The Nolbey House and Saxony House are each "housing accommodations" under FEHA, Cal. Govt. Code § 12927(d); 2 CCR § 12005(o)(2).

77.     The City commits the following unlawful housing practices in violation of FEHA, Cal. Govt. Code § 12955, by enacting, implementing, and threatening the enforcement of EMC Chapters 9.39 or 30.17 or Chapter 30.09, as

-24-

amended:

     a.     discriminating against or harassing any person because of disability, Cal. Govt. Code § 12955(a);

     b.     making or causing to be made any written or oral inquiry concerning the disability of any person seeking rent any housing accommodation, Cal. Govt. Code § 12955(b);

     c.     making, printing or publishing any statement with respect to rental of any housing accommodation that indicates a limitation based on disability, Cal. Govt. Code § 12955(c);

     d.     aiding, abetting, inciting, compelling, or coercing the doing of any of the acts or practices declared unlawful under FEHA, Cal. Govt. Code § 12955, or attempting to do so, Cal. Govt. Code § 12955(g);

     e.     otherwise making unavailable or deny a dwelling based on discrimination because of disability, Cal. Govt. Code § 12955(k); and,

     f.     discriminating through public or private land use practices, decisions, and authorizations because of disability, including zoning laws, denials of use permits, and other actions authorized under the Planning and Zoning Law (Title 7 (commencing with Section 65000)), that make housing opportunities unavailable, Cal. Govt. Code § 12955(l).

78.     Each plaintiff will prove that the City committed each of the unlawful housing practices listed in paragraph 77 under either the disparate treatment theory, adducing direct and circumstantial evidence of the City's discriminatory intent or purpose, or under the disparate impact theory, adducing evidence of the exclusionary effect of the City's Zoning Regulations, or both.

79.     Each plaintiff is injured or threatened with injury by the City's commission of the unlawful housing practices list in paragraph 77; accordingly, each is an "aggrieved person" under FEHA, Cal. Govt. Code § 12927(g).

80.     Accordingly, each plaintiff is entitled to the following relief under

FEHA, Cal. Govt. Code § 12989.1:

a.   A declaration that Chapters 9.39 and 30.17 and 30.09, as amended, are unlawful and void, pursuant to FEHA, Cal. Govt. Code §§ 12920, 12948, 12955.6;

b.   An injunction barring the enforcement of Chapters 9.39 and 30.17 and 30.09, as amended, Cal. Govt. Code § 12989.2;

c.   An award of compensatory damages, Cal. Govt. Code § 12989.2; and,

d.   An award of attorneys' fees and costs, Cal. Govt. Code § 12989.2.

**D.   Fourth Claim:  State Planning and Zoning Law**

81.   Plaintiffs reallege and incorporate by reference each preceding paragraph.

82.   The City is a "city," subject to the State Planning and Zoning Law, Cal. Govt. Code §§ 65008.

83.   The Nolbey House and Saxony House are each "residential developments" under Cal. Govt. Code § 65008(f)(2).

84.   The City commits unlawful zoning practice in violation of the State Planning and Zoning Law by enacting, implementing, and threatening the enforcement of EMC Chapters 9.39 or 30.17 or Chapter 30.09, as amended:

a.   denying to any individual or group of individuals the enjoyment of residence, landownership, tenancy, or any other land use in this state because of disability, Cal. Govt. Code § 65008(a)(1)(A);

b.   enacting or administering ordinances pursuant to any law, including the State Planning and Law that prohibits or discriminates against any residential development because of disability, Cal. Govt. Code § 65008(b)(1)(B); and,

c.   denying or conditioning of a residential development based in whole or in part on the fact that the development is intended for occupancy by disabled persons, Cal. Govt. Code § 65008(d)(2)(A).

85.     Each plaintiff will prove that the City committed each of the unlawful zoning practices listed in paragraph 84 under the disparate treatment theory, adducing direct and circumstantial evidence of the City's discriminatory intent or purpose.

86.     Each plaintiff is injured or threatened with injury by the City's commission of the unlawful zoning practices listed in paragraph 78; accordingly, each is entitled to declaratory relief and injunctive relief only.

## V.   RELIEF

87.     Accordingly, each plaintiff seeks entry of a judgment:

a.      That awards compensatory damages to each plaintiff;

b.      That declares EMC Chapter 9.39, Chapter 30.17, and amended Chapter 30.09 to be invalid and void;

c.      That enjoins the City from commission of any of the unlawful or discriminatory practices alleged in this complaint and further orders the City to take affirmative action to counteract the discriminatory effect of those unlawful or discriminatory practices;

d.      That awards attorneys' fees, costs and expenses to each

///

///

///

///

1   plaintiff; and,

2          e.      That awards any other relief to which any plaintiff may be

3   entitled.

4   Dated:  February 19, 2021.

5                              Respectfully submitted,

6   BRANCART & BRANCART                    MUCH SHELIST, P.C.
                                            Garrett Prybylo (SBN 304994)
7   */s/ Christopher Brancart*             gprybylo@muchlaw.com
    Christopher Brancart (SBN 128475)      660 Newport Center Dr., Ste 900
8   cbrancart@brancart.com                 Newport Beach, CA 92660
    P.O. Box 686                           Tel:    (949) 767-2200
9   Pescadero, CA 94060
    Tel:    (650) 8790141
10

11

12                              Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28